UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY M. JOLLY,
        Plaintiff,                                Case No. 08-cv-13250

vs.                                             DISTRICT JUDGE GEORGE CARAM STEEH
                                                  MAGISTRATE JUDGE STEVEN D. PEPE
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
                     Defendant.
=========================/

## REPORT AND RECOMMENDATION

**I.   BACKGROUND**

Jeffrey M. Jolly brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

**A.   Procedural History**

Plaintiff protectively filed an application for DIB on June 27, 2005, alleging disability as of August 1, 2005, due to disc bulging; thoracic scoliosis; degenerative disc disease in his lower back and knees; degenerative joint disease of the right elbow; and neck, shoulder, right elbow, left hand, and knee pain and numbness (R. 65-68, 71).  After Plaintiff's application was denied upon initial review (R. 50-53), an administrative hearing was held on March 17, 2008, at which

Plaintiff was represented by counsel (R. 363).[1]  Vocational Expert ("VE") Lawrence S. Zatkin, also testified (R. 376).

In a April 25, 2008, decision, Administrative Law Judge ("ALJ") David K. Gatto found that Plaintiff was not disabled because he retained the functional capacity to perform other work existing in significant numbers in the national economy (R. 14-22, 363).  On July 7, 2008, the Appeals Council denied review of the ALJ's decision (R. 5-7), at which time the April 25, 2008, decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

**B.    Background Fact**

Plaintiff was 47 years old at the time of his alleged onset of disability (R. 20, 65). Plaintiff graduated from high school, received training as a plumber, and had past relevant work experience as a journeyman plumber (R. 72, 88, 367).  Plaintiff lives with his wife and son, who was 8 years old at the time of the hearing (R. 368).

*1.    Plaintiff's Testimony and Statements*

Plaintiff stopped working in August of 2005 because he "couldn't take it.  Absolutely couldn't take it anymore" (R. 368).  Plaintiff stated that he helped get his son ready for school in the morning by getting his clothes out, making his lunch, and taking him to the end of the driveway to wait for the bus (R. 368-69).  Plaintiff could sit for half an hour and walk the length of his driveway, but could not stand and walk for two hours without sitting down (R. 371).  Plaintiff claimed that he could only lift a half gallon of milk without experiencing pain (R. 373).

On bad days Plaintiff experienced pain, even when medicated (R. 372).  Plaintiff testified that in an average month, three quarters of the days were "bad days" (R. 372-73). On "bad days"

---

[1] Plaintiff is currently represented by different counsel.

he would sit down or lie down (R. 373-74).  Plaintiff indicated he would over medicate when his pain level went up (R. 374).

### 2. *Medical Evidence Prior to Plaintiff's Alleged Onset Date of August 1, 2005*

On December 10, 2003, Geoffrey K. Seidel, M.D., saw Plaintiff for complaints of cervical and upper thoracic back pain (R. 119-22).  Plaintiff told Dr. Seidel that he was "[u]nemployed by virtue of lack of job availability" (R. 119).  Plaintiff reported that his back problems began gradually about four months earlier, although he had experienced "achiness" in his upper thoracic region for years after diving off of a dock about 10 years earlier (R. 119-20).  Plaintiff reported pain from the base of his neck extending up to his skull causing headaches (R. 120).  Plaintiff also claimed problems with his right arm as the result of arm wrestling several years earlier (R. 120).  X-rays revealed mild degenerative changes at T4, T5 and T6 (R. 120, 124).  On examination, Plaintiff had a full range of motion in both shoulders and full flexion and extension of his cervical spine (R. 120).  Dr. Seidel assessed Plaintiff with chronic cervical and upper thoracic pain, thoracic kyphosis, remote trauma to the cervical spine, suspected degenerative joint changes in the cervical and upper thoracic spine, and possible atypical cervical radiculopathy in the left upper arm (R. 121).

On December 17, Dr. Seidel conducted an electrodiagnostic examination of Plaintiff's left upper extremity which revealed borderline left median mononeuropathy causing intermittent numbness and tingling with no evidence of left cervical radiculopathy or carpal tunnel (R. 118).  Dr. Seidel noted that Plaintiff's symptoms were "very well controlled."

On January 15, 2004, Dr. Seidel assessed Plaintiff with degenerative joint disease of the cervical spine (R. 114).  Dr. Seidel also noted that Plaintiff had arthritis and bony fragments in his right elbow and that he would be seeing James J. Dietz, M.D., for his elbow problems.

3

On February 23, 2004, Dr. Dietz performed arthroscopic surgery on Plaintiff's right elbow (R. 289-90).

On April 12, 2004, Dr. Seidel assessed Plaintiff with degenerative joint disease of the cervical and thoracic spine, degenerative thoracic kyphosis, and chronic degenerative arthritis of both knees (R. 113). Dr. Seidel noted that Plaintiff's mother died in March and that his "psychosocial stresses are significant." Plaintiff told Dr. Seidel that he had a family history of addictive problems, and Dr. Seidel "reviewed the fact that narcotic medications are really not the solution."

A magnetic resonance imaging study ("MRI") on April 25, 2004, revealed disc bulges with disc space narrowing at multiple levels consistent with degenerative changes, but with no evidence of spinal stenosis (R. 123).

On November 12, 2004, Plaintiff saw Robert Levine, M.D., at Shores Primary Care for complaints of chronic low back and neck pain and was given a prescription for Vicodin[2] (R. 303).[3] On November 18, Plaintiff claimed that the Vicodin was only helping to lower his back pain (R. 304). In January 2005, Plaintiff reported persistent neck and back pain and that his medication dulled the pain (R. 306). On March 9, a physician's assistant noted that Plaintiff wanted to "get off the pills [and] wants pain relief" (R. 307). On March 30, Plaintiff called requesting a Vicodin refill, but it was noted that the request was "too early" (R. 133, 334).

---

[2] Plaintiff's Vicodin prescription was refilled six times between December 2004 and April 2005 (R. 333).

[3] Ronald Barnett, D.O. and Robert Levine, M.D. are colleagues at Shores Primary Care (*see* R. 333). The record credits Ex. 16F (R. 303-335) to Dr. Barnett, and not Dr. Levine. Plaintiff, however, indicates in his Disability Report that he was seen by Robert Levine, M.D. (R. 74), and does not list Dr. Barnett as a treating physician. On April 14, 2005, Dr. William H. Kole, M.D., sends a letter to Dr. Barnett regarding *his* patient (R. 139). On November 2, 2005, Dr. Zinkel sends a letter to Dr. Levine regarding *his* patient (R. 179). It therefore is not clear which doctor Plaintiff saw at Shores Primary Care, and indeed he may have seen both.

4

On April 14, 2005, Plaintiff was evaluated by William H. Kole, M.D., for the primary complaint of thoracic spine pain (R. 139-42). Plaintiff described his pain as aching, sharp, shooting, and throbbing, with associated tingling, pins and needles, and muscle spasms (R. 139). Plaintiff characterized his worst pain as 10/10 and 7/10 with medication. Plaintiff stated that he was taking three Vicodin pills per day even though his prescription was for two per day. A physical examination of Plaintiff's back revealed no lordosis, kyphosis, or scoliosis, and Plaintiff was able to touch his toes without any difficulty (R. 141). On April 19, Dr. Kole noted a limited range of motion in Plaintiff's thoracic and cervical spine and assessed Plaintiff with degenerative disc disease of the cervical and thoracic spine, cervical/thoracic spondylosis/facet arthritis, and right knee pain (R. 158-59). Dr. Kole noted that Vicodin did not help with Plaintiff's pain and started Plaintiff on Kadian (R. 159). On May 10, Plaintiff reported that the Kadian helped somewhat (R. 156). Dr. Kole also started Plaintiff on a Duragesic Patch. On May 16, Plaintiff reported that the Duragesic Patch did not work and that he was experiencing withdrawal symptoms (R. 153). On June 7, Dr. Kole noted that Methadone helped Plaintiff's thoracic and lumber spine but not his neck pain. Dr. Kole increased Plaintiff's Methadone dosage.

On June 10, MRI studies of Plaintiff's cervical, thoracic, and lumbar spine were performed (R. 184-88). The MRI of his cervical spine revealed several levels of degenerative bulging, but no evidence of herniated discs or spinal stenosis (R. 184). The MRI of his thoracic spine revealed curvature of the thoracic spine to the left, and disc bulges at multiple levels with disc space narrowing without spinal stenosis (R. 188). The MRI of his lumbar spine revealed shallow central disc bulging at L4-5 and minimal bulging at L3-4 and L5-S1 (R. 185).

On June 23, 2005, Dr. Levine noted that Plaintiff was "withdrawing from narcotics" (R. 310). On July 1, Dr. Levine stated that Plaintiff was dependent on narcotics (R. 311).

5

On July 12, 2005, Dr. Kole reported that OxyContin helped Plaintiff's pain without side effects (R. 147).

### 3. *Medical Evidence After Plaintiff's Alleged Onset Date of August 1, 2005*

On August 16, 2005, in a letter addressed to Plumber's Local #98 Benefit Funds, Murray B. Levin, M.D., wrote that Plaintiff experienced "progressive discomfort literally involving the entire spine . . . particularly in the last 6 years" (R. 164). Dr. Levin also wrote that "no specific diagnosis has been made for the cause of the trouble" and that "the nature of which is not clear to me at all." Nonetheless, Dr. Levin opined that Plaintiff's condition was "sufficiently severe to interfere with his function as a plumber, or for that matter in any capacity, and I feel that he is disabled, not only from this type of activity, but even the most sedentary and it will be permanent" (R. 166).

On October 6, 2005, Russell E. Holmes, M.D., M.P.H., a physician for the state disability determination agency, reviewed the medical records (R. 167-75). Dr. Holmes noted Dr. Levin's opinion, but rejected it as an issue reserved to the Commissioner (R. 173). Dr. Holmes opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours, sit about 6 hours, and engage in unlimited pushing or pulling (R. 168). Dr. Holmes also opined that Plaintiff should do no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling, and that he should avoid concentrated exposure to vibration and hazards (R 169).

On November 2, 2005, John L. Zinkel, M.D., a neurosurgeon, evaluated Plaintiff on referral from Dr. Levine (R. 179-83). On physical examination, Plaintiff exhibited a full range of cervical, thoracic, and lumbar motion, and the neurological examination was normal (R. 181).

6

Dr. Zinkel reviewed the cervical and lumbar MRIs taken on June 6, 2005, concluding that they were "neurosurgically unremarkable" (R. 182). Dr. Zinkel assessed Plaintiff with nonsurgical cervicothoracic and lumbosacral pain, and recommended nonsurgical pain management.

On November 14, 2005, Kanwaldeep S. Sidhu, M.D., an orthopedic spine surgeon and a colleague of James J. Dietz, M.D., evaluated Plaintiff (R. 284). Dr. Sidhu reviewed Plaintiff's MRIs, noting that the lumbar MRI showed "mild dark disc[s]" and that the cervical and thoracic MRIs were negative. Dr. Sidhu also noted that Plaintiff was "on 160 mg of OxyContin everyday" and that he had "absolutely no idea why he is in so much pain. He certainly should not be taking OxyContin 160 mg a day." Dr. Sidhu opined that Plaintiff was not a surgical candidate and stated that he did not want Plaintiff to see him again.

On November and December 2005, Dr. Kole gave Plaintiff myofascial trigger point injections (R. 282-83). After the December injections, Dr. Kole noted that Plaintiff was doing well with no complications (R. 282).

On December 20, 2005, Plaintiff was evaluated for physical therapy but an assessment was unable to be completed due to Plaintiff's indication that he did not want to return because his insurance would not cover aquatic physical therapy (R. 221).

On December 27, 2005, Dr. Levine noted that Plaintiff was going through withdrawal from OxyContin (R. 314). In January 2006, Dr. Levine reported that Plaintiff wanted a second opinion about surgery (R. 315).

In January 2006, Plaintiff told David Mendelson, M.D., who had evaluated him for right knee complaints, that his back went out when he was lifting up his boat trailer (R. 189-91). X-rays of Plaintiff's lumbar spine revealed "fairly good preservation of the joint space and disc space throughout" (R. 189).

7

In February 2006, Plaintiff was evaluated by Jeffrey S. Fischgrund, M.D. at the Beaumont Orthopaedic Center for an opinion regarding his back pain (R. 230-31). Dr. Fischgrund reviewed Plaintiff's X-rays and MRIs, noting some degenerative changes throughout his lumbar and cervical spine (R. 231, 351). Yet, Dr. Fischgrund explained to Plaintiff that there was very little which could be done surgically because there was no "organic component identifiable on x-ray or CT scan or MRI which is consistent with localized symptomatology or symptom pattern" (R. 231).

In May 2006, Robert Papazian, Psy.D., conducted a psychological evaluation. (R. 341-42). Plaintiff told Dr. Papazian that he had "been denied surgery by several physicians because his case is either too complicated or too dangerous" (R. 341). Dr. Papazian diagnosed Plaintiff with major depressive disorder (R. 342).

In June 2006, Dr. Levine noted "we cannot [prescribe] any narcotics" (R. 320).

On September 7, 2006, Dr. Levine noted that Plaintiff "acknowledges previous issues with narcotic use [and] rehab/pain clinic program" (R. 321). On September 28, Plaintiff asked Dr. Levine to prescribe pain medication (R. 322). Dr. Levine noted that he had a long discussion with Plaintiff about going back on narcotics, and wrote "I won't contribute to relapse" (R. 322). The following day, Plaintiff asked to see Dr. Ronald Barnett, Dr. Levine's colleague at Shores Primary Care, "because Dr. Levine wouldn't give him pain meds" (R. 323).

On January 26, 2007, Alan Peter, M.D., and his P.A. Frank Pilato examined Plaintiff and reviewed his medical history (R. 207-11). Plaintiff was assessed with cervical and lumbar degenerative disc disease with bulging discs (R. 211). On February 1, Dr. Peter prescribed Percocet and referred Plaintiff to Dr. Easton for an M.R.I. of the neck [4] (R. 211). On February 5,

---

[4] The record does not appear to contain any treatment records from Dr. Easton.

8

P.A. Pilato noted a limited range of musculoskeletal motion (R. 206). On March 5, Plaintiff reported good pain control with Percocet (R. 205). A February 8 MRI of Plaintiff's cervical spine revealed minimal to mild degenerative changes with no foraminal narrowing or stenosis (R. 216). On March 16, P.A. Pilato noted: "per Dr. Easton - [Plaintiff] will need cervical fusion" and noted that Plaintiff needed to quit smoking before surgery (R. 204). An April 16 MRI of Plaintiff's lumbar spine revealed diffuse degenerative disc disease most pronounced at L4-5 and L5-S1 without stenosis or neural foraminal narrowing (R. 215). On June 4, P.A. Pilato reported that Plaintiff was scheduled for a cervical fusion in two days (R. 201). On June 11, P.A. Pilato noted that Plaintiff was unable to have his surgery due to the presence of Nicotine in his urine (R. 197). Plaintiff claimed that it was due to chewing Nicotine gum. In July, P.A. Pilato noted that Plaintiff was scheduled for a lumbar fusion in 2008 (R. 195). The record reflects that Plaintiff continued to see P.A. Pilato and/or Dr. Peter on a monthly basis through January 2008 (R. 344-50).

On February 25, 2008, P.A. Pilato and Dr. Peter completed and signed a Physical Residual Functional Capacity Questionnaire form (R. 359-62). Dr. Peter indicated Plaintiff had chronic joint pain in his neck and lumbar spine, bilateral knee pain, and hip pain (R. 359). They wrote that Plaintiff "will soon go for cervical fusion. Then next year lumbar fusion." They opined that Plaintiff could sit and stand for less than two hours at a time, sit less than two hours and stand about four hours in an 8-hours day, needed to take a break to walk every 10-15 minutes, and needed to take unscheduled breaks every 1-2 hours (R. 361). They opined that Plaintiff could rarely lift less than 10 pounds and never lift 10 pounds or more, and that he could never twist, stoop, crouch/squat, climb ladders, or climb stairs (R. 361-62). They indicated both that Plaintiff's impairments were likely to produce both "good days" and "bad days," and that

9

his impairments were likely to produce only "bad days" (R. 362). P.A. Pilato and Dr. Peters indicated that their opinion was based on "MRI findings" (R. 359).

### 4. *Vocational Evidence*

VE Zatkin testified that Plaintiff had past relevant work experience as a plumber (R. 20, 377). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, work experience, and impairments, who was able to occasionally lift 20 pounds, 10 pounds frequently; spend six of eight hours on his feet; occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl; who could not climb ropes or scaffolds nor work at unprotected heights or with dangerous machinery; and who was limited to unskilled work with brief and superficial contact with the public, coworkers and supervisors (R. 377-78). VE Zatkin responded that the individual would be unable to perform Plaintiff's past work, but could perform other jobs such as officer cleaner (5,000 jobs), night watchman (2,500 jobs), and factory assembly jobs (6,000 jobs) (R. 21, 378).

### 5. *ALJ Gatto's January 26, 2007, Decision*

ALJ Gatto found that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2010 (R. 16). Moreover, Plaintiff had not engaged in substantial gainful activity since August 1, 2005, his alleged onset date. The ALJ further found the medical evidence establishes that Plaintiff has the following severe impairments: degenerative disc disease with related pain, degenerative joint disease of the right elbow, degenerative joint disease of the right knee with related pain, arthritis and a major depressive disorder. ALJ Gatto found that Plaintiff did not have an impairment or combination of impairments that met or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. 17). As a result of Plaintiff's depressive disorder, the ALJ Gatto found that Plaintiff experienced moderate

restrictions in activities of daily living, mild difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence and pace. The ALJ also found no documented episodes of extended decompensation.

After considering the evidence of record, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (R. 19-20). ALJ Gatto noted that Plaintiff is fairly active, and this level of activity is inconsistent with Plaintiff's allegation of disability. In addition, Plaintiff has been prescribed medication for his established impairments. The ALJ opined that the record does not suggest that Plaintiff fails to receive significant relief of symptoms with the use of medication (R. 20).

As for the opinion evidence, the ALJ declined to give the opinions of Dr. Levin and Dr. Peter controlling weight (R. 19). ALJ Gatto found that the record lacks objective findings to support the extreme degree of limitations identified by either doctor. Additionally, ALJ Gatto noted that both Dr. Peter's and Dr. Levin's opinions are inconsistent with the Plaintiff's established activity level, which includes helping to care for his son.

The ALJ concluded that Plaintiff retained the residual functional capacity to perform a range of light work, limited additionally by no more than occasional climbing stairs, ramps, and ladders; occasional balancing, stooping, kneeling, crouching, or crawling; no work with hazards, including dangerous machinery or at unprotected heights; and no more than brief and superficial interactions with coworkers, supervisors, and the general public (R. 18). The ALJ further concluded that Plaintiff has at least a high school education, is unable to perform any past relevant work, and should be considered a younger individual on the alleged onset date, which is defined as an individual aged 45-49 (R. 20).[5] Given Plaintiff's age, education, work experience,

---

[5] The ALJ noted that Plaintiff turned fifty on March 9, 2008, and has since been categorized as a person closely approaching advanced age.

and residual functional capacity, ALJ Gatto concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform referring to the jobs identified by VE Zatkin. Accordingly, it was the decision of ALJ Gatto that Plaintiff has not been under a disability within the meaning of the Social Security Act from August 1, 2005, through the date of his decision (R. 21).

## II. ANALYSIS

### A. Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779

(6th Cir. 1987) (hypothetical question must accurately portray Plaintiff's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the Plaintiff's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the Plaintiff."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B.    Factual Analysis

In his motion for summary judgment, Plaintiff argues that the ALJ erred in finding that Plaintiff retained the residual functional capacity for a range of light work, and that, at the very least, the ALJ should have found that Plaintiff retained a residual functional capacity for only sedentary work[6] (Dkt. #8, pp. 11-17). Plaintiff specifically argues that the ALJ erred by adopting the opinion of Dr. Holmes, the reviewing physician for the state disability determination agency, and by rejecting the opinions of Dr. Levin and Dr. Peter (*id.* at 12, 14, 16-17).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions

---

[6] If Plaintiff was restricted to a residual functional capacity for sedentary work, the Medical Vocational Guidelines may direct a finding of disability starting March 9, 2008, the day that Plaintiff turned 50 years old and would be classified as an individual closely approaching advanced age, depending on transferability of skills or ability to perform skilled work (R. 65). 20 C.F.R. subpart P, app. 2 § 201.00(g) and Table No. 1 §§ 201.12, 201.14.

13

and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same). The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

Yet, the conclusion of whether a Plaintiff is "disabled" is a decision reserved to the Commissioner to decide (R. 19). 20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2). And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3). The regulations and case law recognize that the opinion of a physician, including a treating physician, is entitled to great weight only if it is supported by adequate medical data, including medical signs and laboratory findings, and does not conflict with other evidence. 20 C.F.R. § 404.1527(d)(2)(3)(4).

Contrary to Plaintiff's contention, ALJ Gatto evaluation of the varying opinions of Dr. Holmes, Dr. Levin, and Dr. Peter is not one this Court should set aside. The ALJ noted Dr. Holmes assessment of Plaintiff's residual functional capacity and accorded it "some weight" (R. 18, 168-69). Dr. Holmes had available the August 16, 2005, evaluation of Dr. Levin that Plaintiff was disabled, but disagreed noting that Plaintiff's claims regarding limitations in

14

walking, lifting, standing and sitting were not consistent with the medical evidence on his impairments (R. 172). In evaluating Plaintiff's residual functional capacity, it appears that the ALJ adopted the exertional limitations in the opinion of Dr. Holmes and augmented it with the nonexertional limitations resulting from Plaintiff's depression (R. 17-18, 168-69).  The ALJ rejected the opinions of Dr. Levin and Dr. Peter because the record lacked objective findings to support the extreme degree of  limitation opined by both doctors, and the opinions were inconsistent with Plaintiff's established activity level (R. 19).

It is not clear that Dr. Levin is a treating source as defined in 20 C.F.R. § 404.1502 and entitled to any enhanced weight.[7]  Dr. Levin evaluated/examined Plaintiff on one occasion, (R. 164-66), and is thus appropriately characterized as a "nontreating source," *i.e.*, a physician who examined Plaintiff but did not have an ongoing treatment relationship with Plaintiff. 20 C.F.R. § 404.1502.  As a nontreating source, Dr. Levin's opinion could never be accorded controlling weight.  SSR 96-2p (in order to give a medical opinion controlling weight, the opinion must come from a "treating source," as defined in 20 C.F.R. § 404.1502).

Plaintiff at his hearing refers to Dr. Peters and the evaluation form was signed by Frank Pilato, PAC, as well as  Dr. Peters on February 25,2008, and noted Plaintiff was first seen on January 26, 2007 (R. 207). It appears that Dr. Peter's  treatment notes were also prepared by P.A. Pilato, which is not an uncommon practice.  Plaintiff does not appear to dispute the reasons given by the ALJ for rejecting the opinions of Dr. Levin and Dr. Peter.  Instead, Plaintiff argues

---

[7] 20 C.F.R. § 404.1502:  "Treating source means your own physician . . . who provides you . . . with medical treatment or evaluation and who has, or has had, an ongoing relationship with you."  While Plaintiff's counsel states Plaintiff was "his patient" referring to Dr. Levin, (Plaintiff's brief at p. 8) Dr. Murray Levin is not listed by Plaintiff as a treater or prescriber of medicine (R. 73-75. R. 97, R. 103) and Dr. Levin never refers to Plaintiff as "his patient" (R. 164-66).  There also are no treatment notes from Dr. Levin.  Plaintiff's hearing brief mentions Dr. Peters, but not Dr. Levin.  Plaintiff was seen by a Dr. Robert Levine.

15

that Dr. Levin and Dr. Peter, as treating physicians are automatically entitled to more weight than a state agency physician (Dkt. #8, pp. 12-13). Again, it is not clear Dr Levin is a treating source. Also, as noted above, a treating source's opinion can only be given controlling weight when it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Here there are no treatment notes or other records from Dr. Levin. ALJ Gatto found that the opinions of both Dr. Levin and Dr. Peter lack support and they are inconsistent with other substantial evidence in the record.

Dr. Levin's "disability letter" does not identify any objective evidence on which he bases his opinion that Plaintiff is permanently disabled. To the contrary, Dr. Levin notes that no specific diagnosis has been made for the cause of Plaintiff's problems and that the nature of Plaintiff's disorder is not clear (R. 164, 166).

Although Dr. Peter identifies "MRI findings" as the basis for his opinion, he does not discuss in any detail which specific MRI findings he finds indicative of the extreme limitations assessed (R. 359). The two MIR's in the record are not those to which the Commissioner would necessarily have to find a disabling impairment. [8] ALJ Gatto questioned Dr. Peter's statement that Plaintiff would undergo a cervical and then a lumbar fusion despite other medical sources saying that Plaintiff was not a candidate for surgery (R. 19). It cannot be said this report or that of Dr. Levin necessarily trump a report of a non-examining state medical consultant.

Additionally, the opinions of both Dr. Levin and Dr. Peter are countered by other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(4). The ALJ found that Plaintiff's

---

[8] Again, the February 8, 2007, MRI of Plaintiff's cervical spine revealed minimal to mild degenerative changes with no foraminal narrowing or stenosis (R. 216). The April 16, 2007, MRI of Plaintiff's lumbar spine revealed diffuse degenerative disc disease most pronounced at L4-5 and L5-S1 without stenosis or neural foraminal narrowing (R. 215).

16

documented level of activity was inconsistent with the limitations opined by Dr. Levin and Dr. Peter (R. 19).  The ALJ noted that Plaintiff was able to fish and sculpt, at least on a rare occasion, attend church regularly, do grocery shopping, help take care of his young son, prepare meals, do household chores, and use a riding lawn mower (R. 17, 80-84, 369, 371, 375-76).

Aside from some inconsistency with Plaintiff's actual activities, both opinions are also inconsistent with certain other medical evidence in the record.  Dr. Zinkel, a neurosurgeon, evaluated Plaintiff in November 2005, finding that his neurological examination was normal and that he exhibited a full range of cervical, thoracic and lumbar motion (R. 181). Dr. Zinkel also reviewed Plaintiff's June 2005 MRIs, finding that they were "neurosurgically unremarkable" (R. 182).  Likewise, as noted by the ALJ, Dr. Sidhu evaluated Plaintiff later that month and noted that Plaintiff's cervical and thoracic MRIs were negative and that his lumbar MRI showed only "mild dark disc[s]" (R. 19, 284).  Dr. Sidhu stated that he had "absolutely no idea why [Plaintiff] is in so much pain" and opined that Plaintiff was not a surgical candidate (R. 284).  In February 2006, Dr. Fischgrund reviewed Plaintiff's x-rays and MRIs and explained to Plaintiff that there was very little which could be done surgically (R. 231, 251).

In this case the ALJ properly evaluated the opinion evidence of record.  His analysis followed the proper legal standards and his findings are supported by substantial evidence. *McClanahan*, *v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).  Substantial evidence supports the ALJ's finding that Plaintiff was not disabled from August 1, 2005, through the date of decision, because he retained the functional capacity to perform other work available in significant numbers in the national economy.  According, the ALJ's weighing of this evidence should not be disturbed upon judicial review.

**III.    RECOMMENDATION**

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 23, 2009                                                              s/ Steven D. Pepe
Ann Arbor, MI                                                                      United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing *Report and Recommendation* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 23, 2009.

                                                s/John Purdy  
                                                Deputy Clerk